**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BENJAMIN ANCONA AND MARCIA ANCONA,<br><br>    Plaintiffs,<br><br>    v.<br><br>MARK SAMSEL, TOWN OF COVENTRY, CT,<br>and COVENTRY CT POLICE DEPARTMENT,<br><br>    Defendants. | No. 3:16-cv-172 (MPS) |

**MEMORANDUM AND ORDER**

This action arises from a nighttime visit by a police officer to the farmhouse of the plaintiffs, Benjamin and Marcia Ancona, in Coventry, Connecticut. Coventry Police Officer Mark Samsel, who was investigating a complaint by one of the Anconas' tenants, entered their property to interview Benjamin. The plaintiffs allege that they are elderly, that they were not expecting an intrusion at that hour, that Samsel unreasonably used an entrance meant only for expected guests, that he used a flashlight and a body camera to see through their windows, and that his conduct amounted to an unreasonable search in violation of the Fourth Amendment as well as various torts. The plaintiffs also assert a *Monell* claim against the Town of Coventry (the "Town"). (*See* ECF No. 1.)

The defendants have moved for summary judgment on all claims. (ECF No. 19.) The plaintiffs, in their opposition memorandum, state that they have abandoned all claims except (1) the Fourth Amendment unreasonable search claim, (2) the "invasion of privacy/trespass claim", (3) the intentional infliction of emotional distress claims, and (4) the negligent infliction of emotional distress claim. (ECF No 20-1 at 1.) They also have abandoned their claims against all defendants except Officer Samsel. (*Id.*)

1

Because the plaintiffs have abandoned their Fifth and Fourteenth Amendment claims, I DISMISS them. I also DISMISS all claims against the Town and the Coventry Police Department.

For the reasons that follow, I GRANT Samsel's motion for summary judgment on the "invasion of privacy/trespass" and intentional and negligent infliction of emotional distress claims but DENY his motion for summary judgment on the Fourth Amendment claim.

## I. Background

### A. Factual Background[1]

On August 19, 2015, just before 9:00 p.m., Mark Samsel entered the Anconas' property. (ECF Nos. 19-2 at ¶ 13, 20-2 at ¶ 13.) Samsel, an officer with the Coventry Police Department, (ECF Nos. 19-2 at ¶ 1, 20-2 at ¶ 1) was continuing his investigation of a trespass complaint made by the resident of 74 Cross Street, Apartment 4. (*Id.*) Around 6:00 p.m., Samsel was dispatched to that address and spoke with the complainant, David Parsons. (ECF Nos. 19-2 at ¶ 2, 20-2 at ¶ 2.) The Anconas are the landlords for the 74 Cross Street property, and Parsons is one of their tenants. (ECF Nos. 19-2 at ¶ 4, 20-2 at ¶ 4.)

During Samsel's discussion with Parsons, Parsons signed a sworn statement describing how his landlord, Benjamin Ancona, had entered his apartment that day without his knowledge or consent. (ECF Nos. 19-2 at ¶ 2, 19-6, 20-2 at ¶ 2.) Parsons stated that since March 2015, when he moved in, there had been no working smoke detectors in his unit. (ECF Nos. 19-2 at ¶¶ 4–5, 19-6, 20-2 at ¶ 4–5.) He stated that he informed the building inspector about the problem but no action was taken, so he then called the Coventry Fire Marshal at 3:30 p.m. on August 19, 2015. (ECF

---

[1] The facts are taken from the defendants' Local Rule 56(a)(1) Statement (ECF. No. 19-2) and the plaintiffs' Local Rule 56(a)(2) Statement (ECF No. 20-2). The facts are undisputed unless otherwise indicated. The plaintiffs state that some facts are "denied because the defendant's averment is not a material fact," and cite no evidence in the record. (ECF No. 20-2.) Where I instead find that those facts are material, I will treat this as an admission. *See* D. Conn. L. R. 56.

Nos. 19-2 at ¶¶ 6–7, 19-6, 20-2 at ¶¶ 6–7.) The Fire Marshal indicated to Parsons that, if the landlord came to make repairs on the smoke detector, Parsons should let him in. (ECF Nos. 19-2 at ¶ 8, 19-6, 20-2 at ¶ 8.) Parsons stated that, around 4:45 p.m., Benjamin Ancona entered his apartment while he was in the shower, without his permission. (ECF Nos. 19-2 at ¶ 9, 19-6.)[2]

Around 9:00 p.m. that night, Samsel went to the Ancona residence to speak with Benjamin Ancona about the incident and to "further his investigation." (ECF Nos. 19-2 at ¶ 13, 19-3 at 2, 20-2 at ¶ 13.) He drove into the Anconas' driveway. (ECF Nos. 19-2 at ¶ 18, 19-9, 20-2 at ¶ 18.) Samsel was wearing a body camera, which captured the events of that evening. The resulting video was preserved in its native form and submitted as evidence: the parties do not dispute that it accurately depicts what occurred that evening, although at times it is too dark to discern relevant events clearly. (ECF Nos. 19-2 at ¶¶ 15–17, 20-2 at ¶¶ 15–17.) It was completely dark outside: the video shows that Samsel likely could only see what was in his headlights, or, later, what was illuminated by his flashlight or the houselights. (ECF Nos. 19-2 at ¶ 19, 19-3 at 3, 19-5 at 26, 19-7 at 19–20, 19-9, 20-2 at ¶ 19.)

Samsel continued into the driveway in the dark, drove about halfway down the driveway, stopped "next to the kitchen," and exited his cruiser. (ECF Nos. 19-2 at ¶ 18, 19-4, 20-2 at ¶ 18.) He knocked on the kitchen door. (ECF No. 19-9.) He observed kitchen appliances but did not see anyone, after sweeping his flashlight into the windows and around the room. (ECF No. 19-5 at 10.) He then "observed TV light coming from inside the home through the windows." (ECF No. 19-2 at ¶20, 20-2 at ¶ 20.) Samsel walked to the rear door, "knocked[,] and rang the doorbell[] but received no response." (ECF No. 19-2 at ¶ 21, 20-2 at ¶ 21.)

---

[2] The plaintiffs dispute whether Parsons was in the shower, but this is not a material fact. (ECF No. 20-2 at ¶ 9.) What is relevant is that this is what Parsons wrote in his statement to Samsel. (ECF No. 19-6.)

Although "the rear door [to the Ancona residence] is the primary means of ingress for family, friends, guests[,] and expected licensees," "others not known to the plaintiffs use the front door." (ECF Nos. 20-2 at ¶ 22, 20-3 at 3.) Benjamin Ancona testified in his deposition that he and his wife, as well as guests and parcel services making deliveries, primarily use the back door of the house.[3] (ECF No. 19-7 at 9–10.) While the driveway naturally leads to the back door, the back door would not be visible from the road, even in broad daylight. One must drive past the front door (kitchen door) to get to the back of the house. (ECF No. 19-4.) There is a stoop leading up to the back door from the driveway. (ECF No. 19-9 at 1:29.)

While waiting for a response at the door, Samsel asked the dispatch operator to call the house and alert the residents to his presence. (ECF No. 19-9 at 2:04–2:20.) Samsel received no response at the backdoor, and the dispatch operator told him that she could not get an answer either on the home phone or on the residents' cell phone. (*Id.* at 3:41.) She said that she would call them

---

[3] The deposition testimony states:

> Q. . . . What entrance/exit do you primarily use?
> A. The one in the back.
> Q. Okay. So the one –
> A. This one here (indicating).
> Q. So that's where you enter and exit?
> A. Yes.
> Q. Is that where guests enter?
> A. We park the car there and walk in. There's the mudroom there too.
> Q. And that's typically where guests enter?
> A. Yes.
> Q. Have you ever had deliveries to the house, UPS or FedEx?
> A. Yes.
> Q. Where do they typically go?
> A. What's easier for them.
> Q. Whatever's easier for them. Do they ever come to the back door?
> A. Yes.
> Q. Okay. So it is – it sounds like the rear entrance is really your main entrance.
> A. Yes, main entrance.
> Q. Okay. It's the one you primarily use.
> A. Yes.

(ECF No. 19-7 at 9–10.)

on the landline again, but Samsel stated that there was "no need. I'll be clearing shortly. I'll try back in the morning." (*Id.* at 3:48–50.) He walked back to his cruiser: on the way, he shone his flashlight at the Anconas' windows (*Id.* at 3:55–4:26.) There were no curtains covering these windows, so the light illuminated the inside of the house. (ECF No. 19-7 at 28.) The video is unclear as to whether he was still on the driveway at this time. (*Id.*) He then got back into his car, illuminated the red and blue lights on top of the cruiser, and continued down the driveway to the back of the Anconas' house. (ECF Nos. 19-2 at ¶ 24, 20-2 at ¶ 24.)

At that point, the outside lights of the home were turned on, and Samsel notified the dispatch operator that he had made contact. (ECF Nos. 19-9 at 5:07.) He exited the car and walked up the stairs to the back door stoop. (ECF Nos. 19-2 at ¶ 25, 20-2 at ¶ 25.) Marcia Ancona came to the door. (ECF Nos. 19-2 at ¶ 25, 20-2 at ¶ 25.) Samsel asked for "Benny" (as Parsons had referred to Benjamin Ancona in his statement). (ECF Nos. 19-6, 20-2 at ¶ 25.) In his deposition, Samsel was asked "if the body camera shows that you" "step[ped] to the right before encountering Mrs. Ancona to look through another window to the right of [the] back entrance[,]" "would that be an accurate depiction of your conduct," and Samsel responded "[i]f the body camera shows it, yes." (ECF No. 19-5 at 18.) Benjamin Ancona then came to the door and started speaking with Samsel: he was not wearing a shirt. (*Id.*; ECF No. 19-5 at 19.) They discussed the incident that had occurred with Parsons and the smoke detector earlier that day. (ECF Nos. 19-2 at ¶ 26, 20-2 at ¶ 26.) Ancona declined to provide a written statement. (ECF Nos. 19-2 at ¶ 27, 20-2 at ¶ 27.) Samsel returned to his car and left the property. (ECF Nos. 19-2 at ¶ 28, 20-2 at ¶ 28.)

B. Procedural History

The plaintiffs filed a complaint against Officer Mark Samsel, the Town of Coventry, and the Coventry Police Department on February 3, 2016. (ECF No. 1.) On February 18, 2016, the

defendants filed their answer. (ECF No. 10.) On February 15, 2017, the defendants filed this motion for summary judgment. (ECF No. 19.) The plaintiffs responded on March 8, 2017, abandoning all claims except the Fourth Amendment, invasion of privacy/trespass, and intentional and negligent infliction of emotional distress claims. (ECF No. 20 at 1.) They also abandoned all claims against the Town and the Police Department. (*Id.*)

## II. Standard of Review

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the moving party, Samsel bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). The Court must view the facts "in the light most favorable to the nonmoving party"—here, the plaintiffs—after drawing "all reasonable inferences in [their] favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000) (quotation marks omitted).

## III. Analysis

### A. Fourth Amendment

The Fourth Amendment protects against "unreasonable searches and seizures." "It "indicates with some precision the places and things encompassed by its protections: persons, houses papers, and effects." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) And of these protections, "the home is first among equals." *Id.* "In the home, our cases show, *all* details are intimate details, because the area is held safe from prying government eyes." *Kyllo v. U.S.*, 533 U.S. 27, 37 (2001) (emphasis in original).

"[T]he curtilage of the house," or the area "immediately surrounding [the] house," "enjoys protection as part of the home itself." *Jardines*, 569 U.S. at 5–6. The Fourth Amendment right to "be free from unreasonable governmental intrusion . . . would have little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window." *Id.* at 7 (internal quotation marks and citations omitted). "While law enforcement officers need not shield their eyes when passing by the home on public thoroughfares, an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas." *Id.* (internal quotation marks and citations omitted).

In *Jardines*, however, the Court described how even the home is subject to a public license, which officers, as well as passers-by, enjoy:

> We have . . . recognized that the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers[,] and peddlers of all kinds. This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do."

*Id.* at 8 (internal quotation marks and citations omitted). *Jardines* also stated that "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose." 569 U.S. at 9.

Although shining a flashlight into a dark window is not by itself a violation of the Fourth Amendment, *see Texas v. Brown*, 460 U.S. 730, 739–40 (1983) ("It is likewise beyond dispute that Maples' action in shining his flashlight to illuminate the interior of Brown's car trenched upon no

7

right secured to the latter by the Fourth Amendment. . . . The use of a searchlight is comparable to the use of a marine glass or a field glass. It is not prohibited by the Constitution. Numerous other courts have agreed that the use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection.") (internal alterations, quotation marks, and citations omitted), shining a flashlight into a dark window from a vantage point not itself within the limits of the public license to approach a home can be. *See, e.g.*, *U.S. v. Alicea*, No. CR15-0080, 2015 WL 7460004, at *7 (N.D. Iowa Nov. 24, 2015). This prohibition stems from the fact that physical trespass on private areas is a Fourth Amendment violation: stepping off a marked path to an entrance and using a flashlight to view the inside of the home from a vantage point not within the license to approach the home afforded the general public constitutes an unconstitutional search. *Id.* at *6–7 (citing 569 U.S. at 6–10).

After reviewing the record in this case, I find that there remains a triable issue as to whether Samsel violated the Fourth Amendment by physically trespassing outside the public license to approach the Anconas' home. Samsel went to the Anconas' house that night to investigate the complaint of unauthorized entry that he had received from Parsons. (ECF Nos. 19-2 at ¶ 1, 20-2 at ¶ 1.) His purpose there was to make contact with Benjamin Ancona and discuss the incident. (ECF nos. 19-2 at ¶ 13, 19-3 at 2, 20-2 at ¶ 13.) Under *Jardines*, he was allowed to do so without a warrant—provided his approach to the Anconas' house did not exceed what "the Nation's Girl Scouts and trick-or-treaters" would have done in this situation. 569 U.S. at 8. Samsel entered the Anconas' driveway in the dark and stopped at the kitchen door and then later proceeded to the back door, which, as noted, was not visible from the street, was covered by a roof, and faced a back porch. (ECF No. 19-9 at 0:26.) The Anconas themselves state that the rear entrance was the one used by them, their guests, and persons making deliveries. (ECF Nos. 19-7 at 9–10, 20-2 at ¶

8

22, 20-3 at 3.) Even in the dark, it was evident that the driveway extended to the back of the house, cars were parked there, and there were steps to the back porch leading directly from the driveway. (ECF No. 19-9 at 1:29.) Thus, Samsel's decision to knock on the door at the rear entrance—although plainly within "curtilage" under *Jardines*, 569 U.S. at 7 (describing a front porch as "the classic exemplar of an area adjacent to the home and to which the activity of home life extends" (internal quotation marks omitted))—is compatible with what a member of the public might do when approaching the house to make contact with the Anconas.

The problem, though, is that Samsel did not just go to the rear door and knock. After knocking on two of the Anconas' doors, calling them on two separate phones, and receiving no response, he walked back to his police car—along the way, shining his light into several dark windows in the rear of the home. (ECF No. 19-9 at 3:55–4:26.) The video is unclear at this point whether he stepped off the marked path to get a closer look into those windows. (*Id.*) If Samsel did leave the driveway or another path intended for those approaching the house, he was trespassing on Fourth Amendment-protected curtilage, outside the public license. Based on the video, it appears that, like the back porch itself, this area of the home was not visible from the street, was close up against the windows, and was closely associated with private areas of the home. A member of the public, trying to contact the residents, would not have been entitled to step off a defined path and sidle up to the house to shine a flashlight in darkened windows; doing so would be "physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner." *Jardines*, 569 U.S. at 6. As a police officer, Samsel's doing so would thus be a violation of the Anconas' Fourth Amendment right to be free from an unreasonable search. If, however, Samsel did not leave the path then his actions were

constitutional. This uncertainty—which is not resolved by the video from the body camera—leaves a disputed issue of material fact.

Qualified immunity does not protect Samsel either. Samsel is entitled to qualified immunity (1) "if [his] actions did not violate clearly established law" or (2) if "it was objectively reasonable for [him] to believe that [his] action did not violate such law." *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007) (internal citations omitted). A determination of whether clearly established law existed must "consider whether a reasonable officer could have believed that the *specific action* taken by the defendant was foreclosed by clearly established law." *Caldarola v. Calabrese*, 298 F.3d 156, 161 (2d Cir. 2002) (emphasis added); *see also White v. Pauly*, 137 S. Ct. 548, 552 (2017).

At least since *Jardines*, the law has been clearly established that—absent a warrant or exigent circumstances—an officer may use a clearly-marked path to the entrance of a private home and knock and wait briefly for an answer, but may not exceed the limits of that public license. 569 U.S. at 7–8. Because Samsel stated that he was visiting the Anconas' property to "further his investigation," and because Samsel had no warrant and there were no exigent circumstances, this is the specific standard that applies (ECF No. 19-2 at ¶ 13, 20-2 at ¶ 13): if Samsel stepped off the path—as it appears he may have when he shone his light in the windows after stepping down from the back porch—he violated clearly established law.

When the facts that are material to the qualified immunity decision are not in dispute, courts should "decide the issue of qualified immunity as a matter of law, preferably on a pretrial motion for summary judgment when possible[.]" *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990). Here, though, there remains a factual issue for trial about whether Samsel trespassed outside of the public

right of access to the Anconas' home, leaving the path to shine a flashlight in their darkened windows. So Samsel is not entitled to qualified immunity at the summary judgment stage.

I DENY Samsel's motion for summary judgment on the Fourth Amendment claim and deny any qualified immunity defense at this time as well.

B. Trespass[4]

"The essentials of an action for trespass are: (1) ownership or possessory interest in land by the Plaintiff, (2) invasion, intrusion[,] or entry by the Defendant affecting the Plaintiff's exclusive possessory interest; (3) done intentionally; and (4) causing direct injury." *Bristol v. Tilcon Materials, Inc.*, 284 Conn. 55, 87–88 (2007). Connecticut law "treat[s] as licensees police officers who are on private property in the exercise of their duties." *Morin v. Bell Court Condominium Ass'n, Inc.* 223 Conn. 323 (1992) (internal citations omitted); *see also Roberts v.*

---

[4] In their complaint the plaintiffs state that their second cause of action is "trespass-invasion of privacy." (ECF No. 1 at 7.) But that count specifically addresses only trespass; the plaintiffs state that they "seek damages as a result of Officer Samsel's invasion of the plaintiffs' right to quiet enjoyment of their private property," which is a reference to an implied covenant in leases, rather than the standard for an invasion of privacy claim. The defendants therefore only addressed a trespass claim in their summary judgment memorandum. (ECF No. 19-1 at 25.) Even so, the plaintiffs, in their opposition memorandum, again say that they are pursuing a claim of "Invasion of Privacy/Trespass." (ECF No. 20-1 at 1.) Invasion of privacy and trespass are distinct state law causes of action with different legal standards and are not properly joined in the same count or factual analysis. (*See* ECF No. 20-1 at 5–6.) Therefore, the plaintiffs' complaint did not adequately state a claim for invasion of privacy, and they cannot now add claims not adequately pled in their complaint. In any event, this claim would fail on the merits. The type of invasion of privacy that the plaintiffs seem to invoke is unreasonable intrusion upon seclusion—one of the "four distinct kinds of invasion of four different interests of the plaintiff[s]" recognized by Connecticut common law. *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 126–27 (1982). "One who intentionally intrudes, physically or otherwise, upon the seclusion of another or his [or her] private affairs or concerns, is subject to liability to the other for invasion of his [or her] privacy, if the actions would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977). The evidence in the record would not permit a reasonable juror to find that Samsel's intrusion would have been highly offensive to a reasonable person. Although the plaintiffs state that they were offended by the late hour of Samsel's visit, 9:00 p.m. is not so late in the evening as to be "highly offensive" to a reasonable person. Further, although Samsel was wearing a body camera, which captured light from the plaintiffs' house, it did not record any of their activities that night before they opened the door. Because it did not reveal any details about their actions that they did not knowingly expose (the body camera footage captured what the plaintiffs were watching on television only *after* they opened the door to speak to Samsel), this also would not have been highly offensive to a reasonable person. *See Graff v. O'Connell*, No. CV010095518S, 2002 WL 450534, at *6 (Conn. Super. Ct. Mar. 5, 2002) ("[T]he plaintiffs have alleged the 'videotaping of the plaintiffs and their property,' but have not alleged that the defendants videotaped any details of the plaintiffs' lives in their home, as specified on the list of protected information. The plaintiffs have not alleged that the defendants have publicized any protected conduct of the plaintiffs. Therefore, the defendants' alleged conduct cannot be considered highly offensive to a reasonable person.").

*Rosenblatt*, 146 Conn. 110 (1959); *Furstein v. Hill*, 218 Conn. 610, 615 (1991) (stating that a police officer "while present on the premises in the performance of a duty under a permission created by law[] occupie[s] a status akin to that of a licensee" (internal citation and quotation marks omitted)).

The defendants argue that the undisputed facts show that Samsel was acting as a police officer—he was following up his investigation of Parson's complaint, he wanted to hear the Anconas' side of the story, and he was "in full police uniform, in the course of his employment, and executing his official duties as a Coventry police officer." (ECF Nos. 19-2 at ¶¶ 13, 30, 19-3 at 2, 19-4 at 7–8.) I agree. The plaintiff has not brought forward evidence to show that these facts are genuinely in dispute.[5] Therefore, I GRANT Samsel's motion for summary judgment on this claim.

C. Intentional Infliction of Emotional Distress

The Connecticut Supreme Court has held that the necessary elements for a claim of intentional infliction of emotional distress are: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 442–43 (2003). Extreme and outrageous conduct "exceed[s] all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Petyan v. Ellis*, 200 Conn. 243, 254 n5. (1986) (internal citations and quotation marks omitted). "The plaintiff must

---

[5] The plaintiffs cursorily state that each of these facts are "denied *because* the defendant's averment is not a material fact." (ECF No. 20-2 at ¶¶ 13, 30) (emphasis added.) As previously stated, because these facts are clearly material to whether Samsel's actions were part of his duty as a police officer, which is fatal to the plaintiffs' trespass claim, I will treat them as admitted.

'prove conduct considerably more egregious than that experienced in the rough and tumble of everyday life.'" *Russo v. City of Hartford*, 341 F. Supp. 2d 85, 120 (D. Conn. 2004) (quoting *Whelan v. Whelan*, 41 Conn. Supp. 519, 520 (Conn. Super. Ct. 1991)). "Liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* (quoting *Hiers v. Cohen*, 31 Conn. Supp. 305, 307–8 (Conn. Super. Ct. 1973)).

Samsel argues that there is no basis for the claim that his acts were extreme and outrageous. I agree. Samsel, according to the video, was professional throughout his encounter with the Anconas. (ECF No. 19-9.) In the video, he asked the dispatch operator to alert the Anconas that he was outside when no one answered the door initially, which indicates that he did not want to startle them. (*Id.* at 2:08–2:26.) Even if the Anconas perceived his actions as rude and disruptive to their evening, 9:00 p.m. is not so late as to be "outrageous" to knock on someone's door. Rather than disputing the factual circumstances, the plaintiffs focus on how they interpreted Samsel's actions. (ECF No. 20-2 at 3–4.) Although they were ruffled by the encounter, the undisputed facts show that Samsel's actions were not "extreme and outrageous" within the meaning of Connecticut law. Therefore, I GRANT the defendant's motion for summary judgment on this claim.

### D. Negligent Infliction of Emotional Distress

Connecticut courts hold that "to prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it was caused, might result in illness or bodily harm." *Carrol v. Allstate Ins.*, 262 Conn. 433, 446 (2003) (internal quotation marks omitted). The defendant argues that, because the plaintiffs also have brought a claim for intentional infliction of emotional distress, they cannot also bring a claim in negligence for the same behavior. I disagree.

It is true that several courts in the District of Connecticut have held that "a plaintiff may not prevail on a negligence claim when he or she has brought claims of intentional use of excessive force and intentional infliction of emotional distress." *See, e.g.*, *Edwards v. City of Hartford*, No. 3:13–cv–878 (WWE), 2015 WL 7458501, at *4 (D. Conn Nov. 23, 2015); *Outlaw v. City of Hartford*, 3:07–cv–01769, 2015 WL 1538230, at *12 (D. Conn. Apr. 6, 2015) ("Courts in this circuit have generally held that where a plaintiff brings claims for excessive force and [intentional infliction of emotional distress], a negligence claim with respect to the same conduct will not lie[.]" (internal citations omitted) (citing cases); *Frappier v. City of Waterbury*, No. 3:07–cv–1457 (WWE), 2008 WL 4980362, at *4 (D. Conn. Nov. 20, 2008). The defendant also cites two New York cases, *Naccarato v. Scaresselli*, 124 F. Supp.2d 36, 45 (N.D.N.Y. 2000) and *Mazurkiewicz v. New York Trans. Auth.*, 810 F. Supp. 563, 570–71 (S.D.N.Y. 1993) for this proposition. (ECF No. 19-2 at 30.)

But other courts in this District have allowed negligence-based and intent-based claims regarding the same conduct to proceed to trial, which is consistent with federal pleading rules. *See Marsh v. Town of East Hartford*, No. 3:16–cv–928 (SRU), 2017 WL 3038305, at *7 (D. Conn. July 18, 2017); *Conroy v. Caron*, No. 3:14–cv–1180 (JAM), 2017 WL 3401250, at *18 (D. Conn. Aug. 8, 2017); *Bussolari v. City of Hartford*, No. 3:14–cv–00149 (JAM), 2016 WL 4272419, at *4 (D. Conn. Aug. 12, 2016); Fed. R. Civ. P. 8(d)(2), (3). In *Bussolari*, Judge Meyer considered the District of Connecticut cases that did not allow pleading both negligence and intent:

> Those decisions cited above that have disallowed simultaneous intentional/negligent tort claims in this context have not elaborated on their reasoning other than to cite the fact of prior court rulings. They rely in part on cases applying New York law that appears to be different from Connecticut law. . . . By contrast, it appears that Connecticut law allows for claims of negligence against police officers, including for negligent arrest and use of force. . . . Similarly, Connecticut courts have allowed for recovery under Connecticut's negligence-based municipal liability statute, Conn. Gen. Stat. § 52-577n, in cases involving

14

> allegations of excessive force by police officers. . . . Ultimately, I do not need to decide whether there is a distinction between the common law of New York and Connecticut. In view that defendants' argument here is simply that the negligence claims must fail because of their inconsistency with the intentional tort claims (rather than a claim that Connecticut law does not allow for negligence claims at all in the excessive force context), my principal concern is the baseline rule that a plaintiff is generally permitted to plead and prove his or her case on alternative and sometimes inconsistent theories of liability. I do not see why a special exception to this general rule should or must exist for claims of intentional and negligent police misconduct in the excessive force context.

*Bussolari*, 2016 WL 4272419, at *3–4 (internal citations and quotation marks omitted). I agree with Judge Meyer. The Federal Rules expressly permit alternative and inconsistent pleading, Fed. R. Civ. P. 8, and the rule against double recovery adequately protects the defendants from having to pay damages for alternative claims based on the same injury.

Nonetheless, I grant summary judgment to Samsel on this claim because there is no evidence in the record from which a reasonable juror could find that Samsel should have realized that his conduct involved a risk of creating emotional distress that, if it were caused, might result in illness or bodily harm. Nothing in the video or any other evidence in the record suggests that Samsel should have realized that his evening visit to the Anconas' farmhouse might cause emotional distress that would make them sick or cause them bodily injury.

In addition, Samsel argues that he is entitled to governmental immunity under Connecticut law, and I agree. "Generally, a municipal employee is liable for the misperformance of ministerial acts but has a qualified immunity in the performance of governmental acts. Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature." *Spears v. Garcia*, 263 Conn. 22, 36 (2003) (internal citations and quotation marks omitted). There are three exceptions to this immunity: (1) "where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm"; (2) "where a statute specifically provides for a cause of action against

15

a municipality or municipal official for failure to enforce certain laws"; and (3) "where the alleged acts involve malice, wantonness or intent to injure, rather than negligence." *Id.* (internal citation, quotation marks, and alterations omitted). The "hallmark of a discretionary act is that it requires the exercise of judgment." *Violano v. Fernandez*, 280 Conn. 310, 318 (2006). "Acts or omissions of police officers in the exercise of their duties are discretionary in nature." *Elinsky v. Marlene*, No. CV960557659, 1997 WL 729102, at *5 (Conn. Super. Ct. Nov. 14, 1997) (internal citations and quotation marks omitted).

Samsel is entitled to governmental immunity because his decision regarding how to investigate the complaint of unauthorized entry was a discretionary act and because the plaintiff does not argue that his conduct falls into any of the three potential exceptions. It is undisputed that Samsel entered the Anconas' property to investigate the complaint that he had received, acting in his duties as a Coventry police officer. (ECF Nos. 19-2 at ¶¶ 13, 30, 19-3 at 2.) The plaintiff does not attempt to make any of the showings necessary to prove that one of the three exceptions applies in this case. (*See* ECF No. 20-1 at 7–8.) Therefore, I GRANT the defendant's motion for summary judgment on the negligent infliction of emotional distress claim.

### IV. Conclusion

For the reasons stated above, I DENY the defendants' motion for summary judgment on the Fourth Amendment claim; I GRANT the defendants' motion for summary judgment on all other claims. And I DISMISS the Town and the Police Department from this action.

IT IS SO ORDERED.

       /s/
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
                 October 20, 2017